UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOUGLAS CORNELL
JACKSON #748757,

        Plaintiff,

v.

THOMAS PERTTU, et al.,

        Defendants.
_____/

Case No. 2:21-cv-00037

Hon. Jane M. Beckering
U.S. District Judge

## REPORT AND RECOMMENDATION

**I. Introduction**

This Report and Recommendation addresses whether Plaintiff exhausted his available administrative remedies prior to filing this lawsuit. On November 29, 2022, the Court held an evidentiary hearing solely on the exhaustion issue.

Plaintiff — state prisoner Douglas Cornell Jackson — filed suit under 42 U.S.C. § 1983 on February 26, 2021. In his verified complaint, Jackson alleged that, while he was confined at the Baraga Correctional Facility (AMF) in Baraga, Michigan, Resident Unit Manager (RUM) Thomas Perttu refused to process Jackson's legal mail and retaliated against him by placing him in segregation in restraints, and that Sergeant (Sgt.) David Pynnonen conducted a retaliatory cell search.

Jackson did not submit a grievance on the issues that he raises in his complaint. Jackson says that he did not file a grievance because Defendants thwarted him by intimidating him with threats to stop him from filing grievances and lawsuits. In rare

circumstances, an administrative remedy will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance [or other administrative] process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 644 (2016).

On October 7, 2021, Defendants filed a motion for summary judgment and supporting brief. (ECF Nos. 40 and 41.) Defendants argued that Plaintiff failed to properly exhaust his claims against them. Plaintiff responded to Defendants' motion. (ECF No. 42.) The undersigned entered a report and recommendation that recommended the Court deny Defendants' motion because that there were genuine issues of fact as to Plaintiff's remaining claims. (ECF No. 52.) On August 17, 2022, the Court adopted the report and recommendation. (ECF No. 53.)

On September 6, 2022, pursuant to *Lee v. Willey*, 789 F.3d 673 (6th Cir. 2015), Defendants requested a hearing on the issue of exhaustion. (ECF No. 55.) The undersigned granted this request on September 14, 2022, and set a 45-day period of discovery relating to the issue of exhaustion of administrative remedies. (ECF No. 59.)

An evidentiary hearing was held on November 29, 2022. Defendants presented MDOC records showing that Plaintiff had not pursued a grievance against them through Step III of the grievance process during the relevant period. Defendants also presented evidence and testimony indicating that the grievance process was available to Plaintiff, but that he failed to use the process with respect to his claims against them.

Plaintiff argued that administrative remedies were not available to him because Defendants thwarted his efforts to use the grievance process through threats and intimidation. Jackson says that RUM Perttu threatened him with harsher cell conditions and restraints if he did stop filing grievances and lawsuits, and then carried out the threat by restraining him and placing him in a harsher cell. Finally, Jackson says that Sgt. Pynnonen conducted the February 2021 retaliatory search of his cell to intimidate him, thereby preventing him from filing grievances and lawsuits.

The undersigned has considered the evidence, testimony and argument presented during this hearing. The undersigned concludes that Defendants have shown, by a preponderance of the evidence, (1) that the grievance process was fully available to Jackson during the relevant period, (2) that Jackson did not file a grievance on the issues he raises in this case, (3) that the actions taken against Jackson by AMF staff on January 15, 2021, were fully justified based on Jackson's own disruptive conduct, (4) that the unit search on February 8, 2021, was not directed at Jackson, (5) that Jackson was not intimidated by Defendants, nor was he thwarted from filing grievances on the issues in this case, and (6) that Jackson's statements to the contrary lack credibility. Accordingly, the undersigned respectfully recommends that the Court dismiss Jackson's case without prejudice due to his failure to exhaust his administrative remedies. Alternatively, it is recommended that the Court dismiss Jackson's case due to his bad faith during the course of this litigation.

## II.     Exhaustion of Remedies

A prisoner's failure to exhaust his administrative remedies is an affirmative

defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-16 (2007). The district court may resolve disputed issues relating to exhaustion in a bench trial or evidentiary hearing if a defendant's motion for summary judgment on the issue of exhaustion is denied because "disputed issues of fact regarding exhaustion under the [Prison Litigation Reform Act] present[ ] a matter of judicial administration. . . ." *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015). Defendants bear "the burden to plead and prove by a preponderance of the evidence" that the prisoner-plaintiff failed to properly exhaust his or her claims. *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)). "The Sixth Circuit has never adopted a burden-shifting approach for the defense of PLRA exhaustion." *Lamb v. Kendrick*, 52 F.4th 286, 295 (6th Cir. 2022).

Upon a showing of a prisoner's "affirmative efforts to comply with the administrative procedures" a prisoner's failure to comply with the exhaustion requirement *may* be excused. *Id.* at 293 (citing *Lee*, 789 F.3d at 677.) Once a prisoner shows affirmative efforts to comply with administrative procedures, the Court must evaluate "whether 'those efforts to exhaust were sufficient under the circumstances.'" *Id.* (citing *Lee*, 789 F.3d at 677.) In other words, a prisoner "is not automatically absolved from the PLRA's exhaustion requirement" by demonstrating that officials interfered with his pursuit of the relevant administrative remedy; the interference must be sufficient to have rendered the remedy unavailable. *Id.* Defendants bear the burden of establishing that the prisoner's efforts were insufficient to excuse the prisoner from the exhaustion requirement. *Id.*, at 295.

"Within the context of these evidentiary hearings, federal district or magistrate

4

judges can resolve all genuine issues of material fact related to the exhaustion of administrative remedies." *Alexander v. Calzetta*, No. 2:16-CV-13293, 2018 WL 8345148, at \*6 (E.D. Mich. Nov. 30, 2018) (citing *Lee*, 789 F.3d at 677-78), *report and recommendation adopted*, No. 16-CV-13293, 2019 WL 1011106 (E.D. Mich. Mar. 4, 2019).[1] Due to the dispositive nature of the hearing, magistrate judges provide report and recommendations regarding their factual findings and recommendations of law.

The undersigned must resolve the issue of whether Plaintiff failed to properly exhaust his claim against Defendants by a preponderance of the evidence. *Lee*, at 677. At all times, Defendants bear the burden of showing that Plaintiff failed to properly exhaust his claim. *Lamb*, at 295.

Based on the testimony, evidence and argument presented during the hearing, the undersigned concludes that Plaintiff Jackson failed to properly exhaust his claim against Defendants and that Jackson was not excused from the PRLA's exhaustion requirement. It is respectfully recommended that the Court dismiss this case without prejudice due to Jackson's failure to exhaust his administrative remedies.

---

[1] A survey of district courts shows that magistrate judges routinely preside over exhaustion evidentiary hearings. *See, e.g., Perry v. Monroe*, No. CIV. 09-239-GPM, 2011 WL 3022229 (S.D. Ill. July 22, 2011); *Alexander v. Salmi*, No. 2:16-CV-96, 2017 WL 3220357 (W.D. Mich. June 27, 2017), report and recommendation adopted, No. 2:16-CV-96, 2017 WL 3190643 (W.D. Mich. July 27, 2017); *Ayotte v. Stemen*, No. 15-13826, 2019 WL 2219739 (E.D. Mich. Feb. 27, 2019); *Alexander v. Calzetta*, No. 2:16-CV-13293, 2018 WL 8345148, at \*6 (E.D. Mich. Nov. 30, 2018), report and recommendation adopted, No. 16-CV-13293, 2019 WL 1011106 (E.D. Mich. Mar. 4, 2019).

### III. Jackson's Complaint Allegations

During the events of this complaint and until August of 2021, Jackson was an inmate at AMF. (ECF No. 1, PageID.1; ECF No. 30.) He was confined in administrative segregation. (ECF No.1, PageID.1.) Before filing this complaint, Jackson had several cases pending in this Court, including at least two others against Sgt. Pynnonen. (*Id.*, PageID.2.)

Jackson says that on January 15, 2021, RUM Perttu refused to receive Jackson's legal mail while making his mail rounds. (*Id.*, PageID.5.) Then, RUM Perttu told Jackson that he was not receiving Jackson's legal mail because Jackson continued to file grievances and lawsuits despite an earlier warning from Sgt. Pynnonen to stop. (*Id.*) A few moments later, RUM Perttu allegedly returned to Jackson's cell and threatened to place Jackson in a different cell under harsh conditions. (*Id.*) Jackson then told RUM Perttu he would stop filing grievances. (*Id.*)

Jackson asserts that later that day he was moved to the abovementioned cell: Segregation Unit 1, cell #122 (cell #1-122). (*Id.*, PageID.6.) Jackson was then allegedly subjected to 24-hour lighting, flooding from the shower, and no recreation. (*Id.*) Jackson believes this was done in retaliation for filing lawsuits. (*Id.*) Jackson also says that the flooding in cell #122 damaged his legal papers and placed him at risk of injury. (*Id.*) After the flooding, Jackson protested, and he was "hog chained" and moved again to cell #1-117. (*Id.*) Finally, late that night, RUM Perttu returned to Jackson's cell in segregation and told Jackson that for filing a complaint against Sgt. Pynnonen, Jackson would have "additional time in those chains" and "remain in [segregation]" as long as

he was imprisoned at AMF. (*Id.*, PageID.6-7.) Jackson argues that the threats and destruction of his legal papers via flooding on January 15, 2021, deterred him from filing grievances and lawsuits. (*Id.*, PageID.7.)

Jackson asserts that on February 8, 2021, more than three weeks after the events involving RUM Perttu, Sgt. Pynnonen supervised a cell search of Jackson's cell. (ECF No. 1, PageID.7.) During this search, Jackson was removed to a different cell to prevent observation of the search. (*Id.*, PageID.8.) Upon returning, Jackson found his legal papers in disarray. (*Id.*) Later, Sgt. Pynnonen returned to Jackson's cell and allegedly told Jackson, "That's for filing lawsuits against me and my co-workers. . . ." (*Id.*, PageID.9.) Jackson alleges that Sgt. Pynnonen threatened him in several ways, including, "to stop filing grievances and lawsuits before you have an accidental death." Jackson also asserts that Sgt. Pynnonen's threats deterred him from filing grievances and lawsuits against AMF employees. (*Id.*, PageID.10.)

## IV. Analysis

During the hearing, MDOC Hearing Administrator and Grievance Section Manager Richard Russell, AMF Grievance Coordinator Thomas Hamel, Defendant AMF RUM Perttu, Defendant AMF Sgt. Pynnonen, and Plaintiff Jackson testified. The Court admitted the following exhibits:

(1) Defendants' Exhibit A, MDOC Policy Directive 03.02.130;

(2) Defendants' Exhibit B, Step III Grievance Report and Step III Grievances;

(3) Defendants' Exhibit C, Prisoner Jackson's Grievance Summary Report;

(4) Defendants' Exhibit D, Prisoner Jackson's Lock History;

(5) Defendants' Exhibit F, Data relating to Defendant Perttu's 1-15-21 rounds;

(6) Defendants' Exhibit H, Critical Incident Report; and

(7) Defendants' Exhibit J, Unit Log Books.

First, it is undisputed that Jackson did not pursue a grievance through the three-step MDOC grievance process by raising the issues that he asserted in this lawsuit. (*See* Defendants' Exh. B and C.) Furthermore, the uncontroverted testimony from witnesses Russell and Hamel establishes that grievance forms were available to Jackson and that he did not pursue a grievance against Defendants on the issues presented in this case. Jackson does not dispute this.

Jackson says that Defendants intimidated him by threatening him with harsher prison conditions and harassment if he did not stop filing lawsuits and grievances. Jackson says that RUM Perttu refused to pick up his mail, moved him to a less favorable cell, and kept him in restraints for more than the 2-hour policy limit solely to get this point across to Jackson. Jackson says that Sgt. Pynnonen had Jackson's cell searched solely to intimidate him. Due to these threats, Jackson says that he told RUM Perttu that he would stop filing grievances.

Jackson presented no evidence to support his intimidation claim. Rather, the uncontroverted documentary and testimonial evidence establishes that the events that occurred in January of 2021 were legitimate responses to Jackson's own disruptive behavior and the February 2021 cell search was part of a routine unit wide cell search. RUM Perttu testified that during the morning of January 15, 2021, he was doing rounds in Jackson's unit but was unable to take Jackson's mail because Jackson had taken

control of his inner cell door slot.[2] Furthermore, RUM Perttu was not involved in moving Jackson to a different cell, restraining Jackson, or monitoring his restraints. Instead, Perttu testified that he worked as the RUM in the general population unit, which is not where Jackson was housed, during first shift (Jan. 15, 7 A.M. to 3 P.M.), and that he only helped out in the segregation unit when necessary. Beyond this, Perttu worked as a corrections officers, working overtime, in the segregation unit during third shift (Jan. 15, 11 P.M. to Jan. 16, 7 A.M.).

According to the Critical Incident Report (Defendant's Exh. H) at about 3:25 P.M. on January 15, 2021, Jackson urinated under his cell door in Unit 1 after he was moved to that cell for similar behavior earlier in the day. Acting Warden Hoffman authorized a move team, chemical agent, and hard restraints. Jackson complied with orders and the restraints were applied without the need to use a chemical agent. A portion of the Critical Incident Report (CIR) regarding these events is shown below.

---

[2] Jackson denied taking control of his cell door slot on January 15, 2021, but testified that, instead of assaulting officers, he routinely takes control of the cell door slot or pushes things into padlocks simply to get attention.

> On 1/15/2021 at approximately 15:25 hours, Housing Unit 1 staff notified Control Center that prisoner Douglas Jackson 748757 was urinating under cell door 1-122. The previous shift moved prisoner Jackson from Housing Unit 2 to Housing Unit 1 due to similar disruptive behavior, this was an attempt to give him an opportunity for a fresh start. At 1656 hours, Acting Deputy Warden ▇ Hoffman authorized the use of a move team, chemical agent and standing hard restraints, to impede any further disruptive behavior. Registered Nurse ▇ Rajala deemed prisoner Jackson a normal risk for chemical agent. A move team consisting of Sergeant ▇ Hoover (Team Leader), Corrections Officers ▇ Haataja (Shield), ▇ Wilson (Breacher 1), ▇ DeForge II (Breacher 2), ▇ Sullivan (Leg Restraints), ▇ Laroux (Wrist Restraints), ▇ Ochampaugh (Camera) assembled in Housing Unit 1. Sgt. Hoover informed prisoner Jackson that authorization for chemical agent, a move team and standing hard restraints was received from Acting Deputy Warden Hoffman. Officer Haataja provided orders to prisoner Jackson to comply to a strip search. Prisoner Jackson complied and was provided with a set of tear-away state blues to put on. Officer Laroux placed leg restraints on prisoner Jackson through the lower food slot, then placed wrist restraints on prisoner Jackson through the upper food slot. The move team opened cell door 1-122 and assisted prisoner Jackson into the Emergency Restraint Chair (ERC). Prisoner Jackson was provided with a face mask and secured in the ERC by the move team. The move team then escorted him to the Housing Unit 1 medical exam room. Upon arrival in the medical room the move team released the ERC restraints and assisted prisoner Jackson out of the ERC, he was then placed face down on the exam table by the move team. The move team simultaneously removed the wrist and leg restraints and applied the standing hard restraints. Upon completion of the standing restraint application, RN Rajala checked for proper pulmonary circulation. The move team then assisted prisoner Jackson off the medical exam table. Officer Haataja applied the adjustment chain to the standing hard restraints and Sgt. Hoover examined the adjustment chain for proper application. The move team assisted prisoner Jackson back into the ERC and secured the ERC restraints. Prisoner Jackson was then transported out of the medical exam room by the move team to A-Wing. Due to the inability to secure the footlocker in cell 1-122, prisoner Jackson was moved to cell 1-117. Sgt. Hoover gave prisoner Jackson an opportunity to select any pending legal work he may have, to take with him to cell 1-117. Prisoner Jackson declined to take any legal work and requested to take one legal book. Officer Laroux retrieved the legal book and Officer Sullivan examined the book for any contraband. The move team transported prisoner Jackson to cell 1-117. The move team released the ERC restraints and assisted prisoner Jackson out of the ERC and into cell 1-117. Sgt. Hoover examined the application of the standing hard restraints and informed prisoner Jackson that he would be most comfortable in either the sitting or laying position. The move team exited cell 1-117. Officers Sullivan and Wilson secured the cell door ending this incident.

(Exhibit H, Page 1 of 19.) The CIR identifies the AMF employees involved in this cell extraction and move. The Logbook shows that Jackson took control of his inner door slot the morning of January 15, 2021. (Exhibit J, ECF No. 84, PageID.594.) Later in the morning two misconduct tickets for disobeying a direct order were reviewed with Jackson. (*Id.*) A 3:25 P.M. Logbook notation indicated that unknown liquid was observed coming from Jackson's cell. (*Id.*, PageID.598) The Logbook shows that RUM Perttu and Sgt. Pynnonen were not involved in the cell moves or in restraining Jackson. (*Id.*, PageID.598-600.)

Jackson testified that Defendants violated policy by keeping him in restraints for more than 2 hours, and that this was done to intimidate him, thus preventing him from

filing a grievance. There are several problems with Jackson's assertion. First, Sgt. Pynnonen testified the policy requires that the officer in charge is responsible for checking the restraints after 2 hours and is not limited to only keeping a prisoner in restraints for 2 hours. Second, Jackson has not established Defendants' involvement in restraining him. Third, Jackson has not shown that the restraints were unjustified based upon his continued disruptive behavior.

Finally, Jackson points to his February 8, 2021, cell search as evidence that he was thwarted from filing grievances by Sgt. Pynnonen. Sgt. Pynnonen testified that on February 8, 2021, Jackson's entire unit was subjected to a shakedown by officers looking for contraband. The Logbook indicates a "Full unit shakedown started" at 7:07 P.M. (Exhibit J, ECF No. 80-1, PageID.571.) Sgt. Pynnonen testified that every prisoner in the unit had their cell searched. In the opinion of the undersigned, Jackson has failed to establish that a routine cell search intimidated him from filing a grievance.[3]

In the opinion of the undersigned RUM Perttu and Sgt. Pynnonen provided credible testimony explaining the events beginning January 15, 2021, and the search of Jackson's unit on February 8, 2021. Jackson's assertion that he was intimidated from filing grievances against Defendants lacks credibility or evidence to support a thwarting claim. Although Jackson was on modified access to the grievance process (which required Jackson to first receive permission to grieve an issue) until January 5, 2021, he continued to file grievances despite his claim of intimidation. A portion of Jackson's

---

[3] Jackson testified that AMF officials did not search every cell in the unit. This point, even if accepted as true, does not change the undersigned's conclusion that Jackson was intimidated by the search.

Grievance Summary (Defendants' Exhibit C) is shown below.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 20210365 | 748757 | JACKSON | AMF | 26I | 3/11/2021 | d | 4/7/2021 | d | 7/23/2021 | d |
| 20210366 | 748757 | JACKSON | AMF | 14A | 3/11/2021 | d | 4/13/2021 | d | 8/3/2021 | d |
| 20210367 | 748757 | JACKSON | AMF | 14F | 3/11/2021 | d | 4/13/2021 | d | 8/3/2021 | d |
| 20210378 | 748757 | JACKSON | AMF | 26A | 3/11/2021 | d | 4/7/2021 | d | 8/3/2021 | d |
| 20210388 | 748757 | JACKSON | AMF | 14A | 3/12/2021 | d | 4/13/2021 | d | 7/28/2021 | d |
| 20210400 | 748757 | JACKSON | AMF | 26Z | 3/16/2021 | d | 4/7/2021 | d | 8/3/2021 | d |
| 20210417 | 748757 | JACKSON | AMF | 19C | 3/17/2021 | d | 4/7/2021 | d | 8/6/2021 | d |
| 20210422 | 748757 | JACKSON | AMF | 27A | 3/17/2021 | x | 4/7/2021 | x | 7/23/2021 | x |
| 20210423 | 748757 | JACKSON | AMF | 11A | 3/18/2021 | d | 4/7/2021 | d | 7/28/2021 | d |
| 20210429 | 748757 | JACKSON | AMF | 22Z | 3/23/2021 | d | 4/22/2021 | d | 8/30/2021 | d |
| 20210434 | 748757 | JACKSON | AMF | 17B | 3/23/2021 | d | 4/20/2021 | d | 8/30/2021 | D |
| 20210435 | 748757 | JACKSON | AMF | 17I | 3/23/2021 | d | 4/22/2021 | d | 8/24/2021 | d |
| 20210438 | 748757 | JACKSON | AMF | 28A | 3/23/2021 | x | 4/13/2021 | x | 7/23/2021 | x |
| 20210439 | 748757 | JACKSON | AMF | 14D | 3/23/2021 | d | 4/27/2021 | d | 7/28/2021 | d |
| 20210485 | 748757 | JACKSON | AMF | 03B | 3/30/2021 | d | 4/29/2021 | d | 8/30/2021 | D |
| 20210492 | 748757 | JACKSON | AMF | 28E | 3/30/2021 | x | 4/13/2021 | x | 7/23/2021 | x |
| 20210493 | 748757 | JACKSON | AMF | 27B | 3/30/2021 | x | 4/13/2021 | x | 7/23/2021 | x |
| 20210499 | 748757 | JACKSON | AMF | 12D1 | 3/31/2021 | d | 4/20/2021 | d | | |
| 20210500 | 748757 | JACKSON | AMF | 26Z | 3/31/2021 | d | 4/27/2021 | d | 8/3/2021 | d |
| 20210550 | 748757 | JACKSON | AMF | 28F | 4/8/2021 | x | 4/20/2021 | x | 8/6/2021 | x |

(ECF No. 74-4, PageID.515.) This summary demonstrates that Jackson filed some 19 grievances in March 2021 alone, which is shortly after the alleged Constitutional violations at issue here on January 15 and February 8, 2021.

There exists no credible evidence to support Jackson's assertion that he was intimidated by Defendants, thus thwarted by Defendants from using the grievance process.[4] Defendants have shown by a preponderance of the evidence (1) that the

---

[4] Jackson failed to present any credible evidence that could establish that he was intimidated by Defendants from filing a grievance. Moreover, the undersigned notes, that Jackson showed no intimidation or any hesitation during the evidentiary hearing. Jackson aggressively challenged RUM Perttu and Sgt. Pynnonen's testimony during

grievance process was fully available to Jackson during the relevant period, (2) that Jackson did not file a grievance on the issues he raises in this case, (3) that the actions taken against Jackson by AMF staff on January 15, 2021, were fully justified based on Jackson's own disruptive conduct, (4) that the unit search on February 8, 2021, was not directed at Jackson, and (5) that Jackson was not intimidated by Defendants, nor was he thwarted from filing grievances on the issues in this case. Instead, Jackson knowingly decided to forgo the grievance process and he immediately filed this lawsuit.[5]

Relatedly, the undersigned concludes that Jackson's testimony lacks credibility for several reasons. The documentary and testimonial evidence establishes (1) that Jackson filed numerous grievances before and after the critical dates in this case (Exhibit C), (2) that neither Defendant was involved in the cell extractions and moves on January 15, 2021, which directly undercuts Jackson's testimony on statements he attributes to Defendants, (3) that the cell moves on that date were entirely justified based on Jackson's disruptive conduct, (4) that the unit shake-down on February 8, 2021, was a routine practice directed at the entire unit, and not specifically at Jackson, (5) that Jackson admitted that he engaged in disruptive behavior including "taking his food slot hostage" and jamming the lock, and (6) that Jackson is a strong-willed and strong-minded person who was in no way intimidated by MDOC staff at AMF.

Thus, the undersigned concludes, based upon the credible evidence presented during the hearing, that the grievance process was available to Jackson and that he,

---

cross examination and again during their direct testimony when Jackson called them as witnesses.

[5] Instead of filing grievances, Jackson filed this complaint dated February 23, 2021. (ECF No. 1, PageID.12.)

without a valid excuse, failed to exhaust his administrative remedies with respect to the claims he raises in this case.

## V. Plaintiff Jackson's Bad Faith

In the opinion of the undersigned, Jackson has demonstrated bad faith in litigating this case. Specifically, he has changed his position on the admissibility of the Defendants' proposed exhibits at a time and in a manner that was intended to obstruct Defendants' case.

On October 28, 2022, the undersigned issued a Case Management Order (CMO) relating to the bench trial on exhaustion. (ECF No. 69.) The CMO directed the parties to file a joint statement that identified their exhibits and objections thereto. (*Id*., PageID.393.) On November 9, 2022, counsel for Defendants, Assistant Attorney General (AAG) Ho, filed a joint statement that listed the exhibits in the case. (ECF No. 75.) Although the joint statement listed objections to various witnesses and Plaintiff's exhibits, the statement failed to identify any objections Jackson had to Defendants' exhibits. (*Id*., PageID.540.) Based on this record, Defendants could expect there to be no objections by Jackson to their proposed exhibits.

But during the Final Pretrial Conference on November 15, 2022, Jackson stated that he objected to all of Defendants' exhibits. He explained that he objected to the exhibits because the parties' joint statement was filed a day late. AAG Ho then advised the Court that he might need to add a records custodian to lay a proper foundation for these exhibits in light of Jackson's newly stated objections. The Court agreed that

Defendants could add records custodians to their witness list. At that point, Jackson complained about the addition of these witnesses.

Several days later, on November 18, 2022, Defendants filed a motion to amend/correct their exhibits. (ECF No. 79.) In the supporting brief, Defendants confirmed that, in preparation for the filing of the parties' joint statement, Jackson had advised AAG Ho that he would not object to the Defendants' proposed exhibits. (ECF No. 80, PageID.557 ("Jackson informed the undersigned that he would not contest any of MDOC Defendants' trial exhibits during a November 8, 2022, phone call to prepare the joint statement").)

During the trial on November 28, 2022, the Court asked Jackson to explain the reason for his change of position on the admissibility of Defendants' exhibits. Jackson asserted that he had not changed position and offered no reasonable explanation.

The undersigned concludes that Jackson's change of heart on the admissibility of Defendants' exhibits reflects bad faith. It is apparent to the Court that Jackson was making mischief and attempting to obstruct the Defendants' case.

This particular act of bad faith must be considered in the larger context of Jackson's litigation history to be fully understood.[6] In December 2020, this Court

---

[6] Jackson has been an active litigant in the federal courts in Michigan. In more than three of Jackson's lawsuits, the Court entered dismissals on the grounds that the cases were frivolous, malicious, and/or failed to state a claim. *See Jackson v. Berean*, No. 1:18-cv-1075 (W.D. Mich. Mar. 19, 2019); *Jackson v. Bouchard*, No. 2:16-cv-246 (W.D. Mich. Dec. 21, 2016); *Jackson v. Evans*, No. 2:11-cv-13524 (E.D. Mich. Aug. 31, 2011). Plaintiff also has been denied leave to proceed *in forma pauperis* on the basis of the three-strikes rule at least nine times. *See Jackson v. Novak*, No. 1:21-cv-1030 (W.D. Mich. Jan. 11, 2022); *Jackson v. Hoffman*, No. 2:21-cv-175 (W.D. Mich. Sept. 2, 2021); *Jackson v. Miller*, No. 2:21-cv-162 (W.D. Mich. Aug. 12, 2021); *Jackson v. Dove*, No. 2:21-cv-53 (W.D. Mich. Mar. 29, 2021); *Jackson v. Kemp*, No. 2:21-cv-33 (W.D. Mich. Mar. 3,

dismissed a case filed by Jackson because he had failed to participate in various hearings leading up to a bench trial on the issue of exhaustion. (*Jackson v. Coronado, et al.*, W.D. Mich. Case No. 2:18-cv-19, ECF No. 88 (R&R), ECF No. 103 (Order adopting R&R).) Jackson appealed this dismissal. The Sixth Circuit noted that Jackson's complaints about his pro bono counsel were made in bad faith and justified dismissal of the case. *See Jackson v. Coronado, et al.*, No. 21-1007, 2021 WL 6335259, at *2 (6th Cir. Nov. 22, 2021) (stating "Jackson openly criticized the performance of counsel even while denying that he sought to have Sarka withdrawn as his lawyer. This behavior reflects bad faith on Jackson's part, further justifying dismissal.")

And, similarly, on October 6, 2022, this Court dismissed another case filed by Jackson. (*Jackson v. Lorendo*, W.D. Mich. Case No. 2:21-cv-13.) As in this case and in *Jackson v. Coronado*, Plaintiff Jackson was awaiting a bench trial on the issue of exhaustion after he had raised a thwarting claim. (*Jackson v. Lorendo*, W.D. Mich. Case No. 2:21-cv-13, ECF No. 117, PageID.537-38 (R&R).) During a status conference in preparation for the bench trial, Jackson's disruptive behavior led the undersigned to terminate the conference and recommend dismissal of Jackson's case. (*Id.*) The district court subsequently agreed with this recommendation. (*Jackson v. Lorendo*, W.D. Mich. Case No. 2:21-cv-13, ECF No. 126 (order adopting R&R).)

The Sixth Circuit has set forth a four-factor test to determine whether dismissal of the case is appropriate: (1) whether the party's failure is due to willfulness, bad faith,

---

2021); *Jackson v. McKee*, No. 2:21-cv-23 (W.D. Mich. Mar. 1, 2021); *Jackson v. Pynnonen*, No. 2:21-cv-26 (W.D. Mich. Feb. 17, 2021); *Jackson v. Taskila*, No. 2:20-cv-38 (W.D. Mich. Apr. 8, 2020); *Jackson v. Berean*, No. 1:19-cv-380 (W.D. Mich. Sept. 27, 2019).

16

or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal of the action. *Mulbah v. Detroit Bd. of Educ.,* 261 F.3d 586, 589 (6th Cir.2001). "While none of these factors is dispositive, a case may be dismissed by a district court where there is a clear record of delay or contumacious conduct on the part of the plaintiff." *Id.* at 591.

Here, Plaintiff Jackson had no good faith reason to change his position on the admissibility of Defendants' exhibits. The timing of his change combined with his subsequent complaint in response to Defendants' request to call records custodians to lay the foundation for exhibits demonstrates and confirms that Jackson was engaging in contumacious, bad faith conduct. The court of appeals has already specifically noted that Jackson had demonstrated bad faith in his litigation practices. And as recently as October 6, 2022, another of Jackson's cases was dismissed based on his bad behavior in court. Based on these factors, the undersigned recommends, as an alternative, dismissal of this case based on Jackson's bad faith.[7]

---

[7] The Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which was enacted on April 26, 1996, amended the procedural rules governing a prisoner's request for the privilege of proceeding *in forma pauperis*. As the Sixth Circuit has stated, the PLRA was "aimed at the skyrocketing numbers of claims filed by prisoners–many of which are meritless–and the corresponding burden those filings have placed on the federal courts." *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997). For that reason, Congress created economic incentives to prompt a prisoner to "stop and think" before filing a complaint. *Id.* For example, a prisoner is liable for the civil action filing fee, and if the prisoner qualifies to proceed *in forma pauperis*, the prisoner may pay the fee through partial payments as outlined in 28 U.S.C. § 1915(b).

Jackson's litigation record in the Western District of Michigan indicates that the economic incentives created by the PLRA have not been sufficient to cause him to "stop

## V.  Conclusion and Recommendation

The undersigned concludes that Defendants have shown, by a preponderance of the evidence, (1) that the grievance process was fully available to Jackson during the relevant period, (2) that Jackson did not file a grievance on the issues he raises in this case, (3) that the actions taken against Jackson by AMF staff on January 15, 2021, were fully justified based on Jackson's own disruptive conduct, (4) that the unit search on February 8, 2021, was not directed at Jackson, (5) that Jackson was not intimidated by Defendants, nor was he thwarted from filing grievances on the issues in this case, and (6) that Jackson's statements to the contrary lack credibility.  Accordingly, the undersigned respectfully recommends that the Court dismiss Jackson's case without prejudice due to his failure to exhaust his administrative remedies.  Alternatively, it is recommended that the Court dismiss Jackson's case due to his bad faith during the course of this litigation.

Finally, for these same reasons, it is recommended that the Court conclude that any issue Jackson might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).  Accordingly, it is recommended that the Court certify that an appeal would not be taken in good faith.

---

and think" before filing a case.  A search of the Court's electronic docket reveals that Jackson filed 23 cases in the Western District of Michigan from 2018 through 2022.  He has not prevailed in any of those cases.  He also has not paid a penny in filing fees and currently owes this Court $23,211.

If the Court finds that Jackson engaged in bad faith litigation tactics, the undersigned recommends that the Court consider asking Defendants to advise the Court whether sanctions against Jackson are warranted.

Dated: July 22, 2020

/s/ *Maarten Vermaat*
MAARTEN VERMAAT
U. S. MAGISTRATE JUDGE

### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).